**Lawrence B. COVILL and Jennie L. Covill, Plaintiffs,**

v.

**Kenneth N. PHILLIPS, Defendant,**

**State Farm Mutual Automobile Insurance Company, Garnishee.**

Civ. A. No. 75–103–C2.

United States District Court, Dist. Kansas.

March 27, 1978.

On Motion for Amendment June 26, 1978.

George W. Thomas, Kansas City, Kan., John C. Risjord, of Niewald, Risjord & Waldeck, Kansas City, Mo., for plaintiffs.

Willard L. Phillips and John J. Jurcyk, Jr., of McAnany, Van Cleave, & Phillips, Kansas City, Kan., for defendant.

Thomas E. Deacy, Jr. and Spencer J. Brown, of Deacy & Deacy, Kansas City, Mo., for garnishee.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

The instant garnishment action, in which the garnishor Lawrence B. Covill seeks to hold the State Farm Mutual Automobile Insurance Company liable for amounts in excess of the policy limits on the judgment rendered against its insured, Kenneth Phillips, in the principal action in this case, was tried to the court from September 27 to September 29, 1977. The evidence in this case raises close questions of fact and law, many of which have not been squarely ad-

dressed by the pertinent case law in the State of Kansas. After making an exhaustive review of the record in light of the applicable law, the court is now prepared to render its findings of fact and conclusions of law with reference to the instant controversy. The court's holding, briefly stated, is that State Farm is indeed liable for the excess judgment of $75,000 rendered against its insured.

In Kansas, an insurer's liability for a so-called "excess judgment" is controlled by *Bollinger v. Nuss*, 202 Kan. 326, 449 P.2d 502 (1969). *Bollinger* held that when a "standard-type liability policy" reserves to the insurer the right to make such investigation and settlement of any claim or suit as it deems expedient, the insurer in defending and settling claims against its insured must act not only in good faith but also without negligence. Breach of these duties of good faith and due care renders the insurer liable for the full amount of the insured's loss, even if that amount exceeds the policy limits in question. *Bollinger* made it clear that the presence of the requisite elements of due care and good faith must be determined on a case by case basis. The analytical framework supplied by *Bollinger* and its progeny, however, has suggested various practical guideposts by which the insurer's adherence to its legal obligations may be measured.

The duty of good faith envisions a standard of conduct much higher than a mere forbearance from malicious conduct toward the insured; it implies honesty, fair dealing, and adequate information. *Bollinger*, 202 Kan. at 341, 449 P.2d at 514. In the context of pretrial settlement negotiations, good faith first requires the insurer to communicate to the insured the results of any investigation indicating liability in excess of policy limits and any offers of settlement which have been made, so that he may take proper steps to protect his own interests. *Bollinger*, 202 Kan. at 339, 449 P.2d at 512. Second, good faith requires the insurance company, in determining whether to accept or reject an offer of compromise, to give equal consideration to its own interests and those of its insured. In other words, the insurer must treat the claim "as if it alone were liable for the entire amount." *Bollinger*, 202 Kan. at 337, 449 P.2d at 511. Third, good faith conduct by an insurer implies action "upon adequate information," *Rector v. Husted*, 214 Kan. 230, 519 P.2d 634 (1974), and presupposes a good faith analysis of information ascertainable by inquiry or investigation. *Rider v. State Farm Mutual Automobile Insurance Company*, 514 F.2d 780 (10th Cir. 1975). Fourth, good faith requires an insurer to honestly evaluate the value of an unlitigated claim based on its apparent merits or lack thereof, the possibility of liability being established, and the probable nature and extent of injuries to be proved. *Bollinger*, 202 Kan. at 341, 449 P.2d at 513. Good faith further compels an insurer to base any rejection of a compromise offer approaching the policy limits upon an honest belief that it can defeat the action or keep any possible judgment within the limits of the policy coverage. *Brown v. Guarantee Insurance Company*, 155 Cal.App.2d 679, 319 P.2d 69 (1958). Finally, at least in potential excess judgment cases where there is no reasonable question as to the liability of the insured, the duty of good faith may require an insurance company to make reasonable, timely efforts to initiate settlement negotiations. *Rector*, 214 Kan. at 241, 519 P.2d at 643. All of the above attributes of good faith, couched alternatively in terms of "due care," are concisely summarized in the statement that "the insurer must conduct itself with that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim." *Bollinger*, 202 Kan. at 338, 449 P.2d at 511; *Bennett v. Conrady*, 180 Kan. 485, 305 P.2d 823 (1957).

In *Bollinger*, the Kansas Supreme Court enumerated eight factors that should be considered in deciding whether an insurer's refusal or failure to settle constituted a breach of its duty of due care or good faith. Those factors are as follows:

1. The strength of the injured claimant's case on the issues of liability and damages;
2. Attempts by the insurer to induce the insured to contribute to a settlement;
3. Failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured;
4. The insurer's rejection of advice of its own attorney or agent;
5. The failure of the insurer to inform the insured of a compromise offer;
6. The amount of financial risk to which each party is exposed in the event of a refusal to settle;
7. The fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and
8. Any other factors tending to establish or negate bad faith on the part of the insurer.

*Bollinger*, 202 Kan. at 338, 449 P.2d at 512. These factors must of course be evaluated "as the case fairly appeared to the insurer and its authorized agents and attorneys during the time the case was under construction." *Rector*, 214 Kan. at 239, 519 P.2d at 641. An insurer will not be held liable for what in hindsight appears to be a "mere error of judgment." *Bollinger*, 202 Kan. at 341, 449 P.2d at 514.

## I. FACTUAL BACKGROUND

The events culminating in the instant litigation may be briefly summarized as follows: On April 6, 1975, Larry Covill and his sister Jennie Covill were seriously injured when the automobile in which they were riding was struck by an automobile driven by Kenneth Phillips, a teenage driver whose car had failed to stop at a stop sign at a rural intersection. As a result of this accident, Larry suffered head injuries and was immediately hospitalized first at Lawrence Memorial Hospital and later at the University of Kansas Medical Center. Although he experienced generalized seizures shortly after admission to the hospital, he later appeared to be "doing very well" and was discharged on April 12, 1975. In the meantime, the Covill family had retained attorneys George Allen and John Risjord to represent Larry and Jennie. As early as April 10, 1975, four days after the accident and before Larry was released from the hospital, Allen began contacting the State Farm Mutual Automobile Insurance Company, the insurer of Kenneth Phillips, demanding divulgence of the policy limits and threatening to sue if such information was not immediately forthcoming. Meanwhile, State Farm had retained the Barber, Emerson, Six, Springer & Zinn law firm of Lawrence, Kansas, to investigate its insured's claim that the accident had resulted from a brake failure. During the course of this investigation of what it viewed as a probably valid defense, State Farm refused to either concede the liability of its insured or to reveal the policy limits of coverage. By May 12, 1975, however, it became apparent to State Farm that the alleged brake failure defense was either weak or non-existent. State Farm therefore immediately notified Allen and Risjord that the policy limits for bodily injury were $50,000 per person and that State Farm wished to commence settlement negotiations regarding the claims of Larry and Jennie Covill. Shortly after receipt of this information on May 21, 1975, Allen and Risjord filed a civil action in this court seeking $250,000 in damages for the injuries suffered by Larry Covill and $100,000 for those suffered by Jennie Covill.

Risjord's response to State Farm's settlement overture was set forth in a letter dated June 2, 1975, wherein he included a statement that Larry had suffered a severe relapse on May 30, 1975, and had been hospitalized in critical condition with stress ulcer, massive internal bleeding, severe pneumonia, and static seizures; an observation that State Farm had had sufficient opportunity to complete its investigation of Larry's claim; and a demand that State Farm tender $50,000, the policy limits on Larry's claim, by June 20, 1975. Risjord and Allen communicated this offer not only to State Farm but also on June 9, 1975, to

Kenneth Phillips through his personal attorney Anne Grether. In view of Kenneth Phillips' youth and the lawsuit's claim for damages vastly in excess of the policy limits, Grether advised Kenneth and his parents to make written demand on State Farm for settlement within the policy limits. Dr. and Mrs. Phillips and Kenneth had a pre-existing appointment scheduled for June 10, 1975, with Gerald Rushfelt, who had been retained by State Farm to handle the defense of the Covill claims. When they met as scheduled, the Phillips family discussed at length with Rushfelt the potential for an excess verdict against Kenneth and executed and delivered the written demand suggested by Grether.

For reasons not disclosed in the record, State Farm did not forward Risjord's June 2, 1975, demand letter to Rushfelt until June 11, 1975. For some reason, however, Rushfelt did not receive it until June 20, 1975, the date on which the offer to settle Larry's claims for the policy limits was to expire. Upon receiving Risjord's letter, Rushfelt immediately called Melbert Haertling, claims superintendent at the Mission, Kansas, State Farm office. Rushfelt and Haertling agreed that the medical facts known to them at the time (five pages of illegible and incomplete records from Larry's hospitalization from April 4 through April 12, 1975) did not warrant payment of the policy limits and that they should request that the offer be kept open beyond the June 20, 1975, deadline in order that they could obtain more information. Rushfelt was unable to reach Allen or Risjord for several days after his talk with Haertling. In conversations with Allen and Risjord on June 23, 24, and 27, however, Rushfelt expressed State Farm's view that the medical records furnished to date did not bear out a valid claim for the policy limits, and he requested that the June 20, 1975, deadline be withdrawn so that usual discovery procedures regarding Larry's physical condition could be undertaken. In response, Allen and Risjord stated that the Covills would not agree to the exhaustive pursuit of discovery by State Farm and that the settlement offer would not be held open indefinitely. Allen and Risjord did agree, however, that they would not adhere strictly to the June 20 deadline; they further promised that they would furnish whatever additional medical information was necessary for State Farm to adequately evaluate Larry's claims. Neither Allen nor Risjord in fact furnished any additional medical information until July 22, 1975, at which time Risjord sent Rushfelt "summaries" of medical records relating to Larry's second hospitalization from May 30 to June 13, 1975, at Strong Memorial Hospital in Rochester, New York, and a report by Dr. Zsolt DePapp, M.D., Larry's family doctor in Rochester. (The latter report, or an earlier version of it, had been received by Allen in the middle of May but had been deemed "completely unacceptable" to Larry's attorneys, who returned the report to New York and suggested that it be destroyed and replaced by a new report more favorable to his case). Risjord, however, enclosed with said medical summaries and report a letter that essentially repudiated the plaintiffs' earlier agreement to keep Larry's settlement offer open for a short indefinite period of time. Risjord's letter stated that in his conversation with Rushfelt on June 24, 1975, his only agreement was that a tender of policy limits at the time of the conversation would be acceptable.

The status of settlement negotiations after Rushfelt received Risjord's letter of June 22, 1975, hung in limbo throughout the late summer and fall of 1975. During this time Larry suffered three additional seizures, the parties to the litigation engaged in various discovery procedures, and Rushfelt made numerous unsuccessful informal efforts to have Larry produced for deposition and medical examination in this judicial district. State Farm, still dissatisfied with the paucity and the nature of the medical evidence forwarded in support of Larry's claims, nevertheless initiated further settlement discussions in late November, 1975. On November 28, 1975, Rushfelt solicited from Risjord an offer to settle Jennie's claim and offered $30,000 to settle Larry's claim. In reply to the $30,000 offer

for Larry, Risjord expressed his belief that "that won't quite do it." On December 4, 1975, however, Risjord summarily advised Larry that such an offer had been made and urged that he reject it. While Rushfelt apparently construed Risjord's comment as a rejection of the $30,000 offer, he was not informed of Larry's rejection of the offer until January 6, 1976, at which time Rushfelt received a written rejection forwarded by Risjord on December 29, 1975. The next day, January 7, 1976, Rushfelt received Risjord's first demand for settlement of Jennie's claims, in the amount of $43,994. On the following day, January 8, Rushfelt received notice that the case had been expedited on the trial docket at the plaintiffs' request and that it was set as the first case on January 26, 1976.

In view of these developments, State Farm decided to extend a second offer of settlement, and on January 12, 1976, Rushfelt offered Risjord $40,000 to settle Larry's claims and $12,500 to settle Jennie's claims. Risjord relayed this offer to Larry in a terse, two-sentence, 22-word post-script to a letter dated January 14, 1976. Larry's rejection of the $40,000 offer was forwarded to Rushfelt on January 16, 1976. In the meantime, Rushfelt apparently received a $35,000 counter-demand for Jennie's claim and a letter from Risjord stating, "if you have any further authority for either claim, please extend it now before we must incur expenses for transporting out-of-town doctors to trial." Thereafter, on January 19, 1976, Rushfelt was authorized by State Farm to offer $17,500 for Jennie's claim and to solicit a demand within policy limits for Larry's claim, with the proviso that settlement of Jennie's claim would be conditioned on settlement of Larry's claim as well. This offer was communicated to Allen, who balked at the suggestion that Larry initiate a new demand for settlement within policy limits and told Rushfelt that he doubted whether such an offer would be forthcoming unless State Farm increased its offer to a higher figure.

On January 22, Rushfelt met with State Farm claims personnel to discuss the status of negotiations. At that time, State Farm authorized Rushfelt to settle Jennie's claim for $25,000 and to settle Larry's claim for $50,000. They agreed, as to the latter claim, that the settlement offer should be couched in terms of "accepting" Larry's demand of June 2, 1975, and that settlement of the two claims could proceed independently of each other. These proposals were immediately relayed to Risjord by telephone. The next day, January 23, 1976, Rushfelt received a letter from Risjord stating that the $50,000 offer for Larry, "coming as it does on this late date on the eve of trial, is rejected by our client." Rushfelt contemporaneously received a letter from Risjord accepting the $25,000 offer for Jennie's claims. After receiving these communications, Rushfelt made several abortive efforts to obtain Larry's reconsideration of State Farm's offer to settle for the policy limits and to ascertain the amount for which Larry would be willing to settle. The failure of these efforts concluded all settlement negotiations and the case proceeded to jury trial as scheduled from January 26 to February 3, 1976.

On February 3, 1976, the jury rendered a verdict of $125,000 on Larry's claim against Kenneth Phillips. Rushfelt, State Farm, Kenneth Phillips, his parents, and their attorney Anne Grether agreed to forsake all post-trial motions and appeals because, in their view, the amount of the verdict did not appear excessive in light of the evidence developed at trial and it was quite foreseeable that the verdict in any new trial would equal or exceed $125,000. On March 10, 1976, Dr. Phillips, Kenneth's father, wrote State Farm, referring to the Phillips' earlier demand for settlement within the policy limits and demanding that State Farm pay the excess judgment of $75,000. Allen and Risjord subsequently initiated, on behalf of Larry Covill, the instant garnishment action against State Farm. Larry Covill thereby undertook to garnish the claim of Kenneth Phillips against State Farm "for negligently and in bad faith refusing to negotiate and settle plaintiff's claim against the defendant within the policy limits," as is allowed under Kansas case

law. *Gilley v. Farmer*, 207 Kan. 536, 485 P.2d 1284 (1971).

## II. ANALYSIS

The garnishor's theory of liability during the trial of this garnishment action was that State Farm acted negligently or in bad faith in three particulars: (1) refusing to reveal the results of the investigation of the insured's car, thus "inviting" the Covills to file suit; (2) dilatory evaluation of Larry's claim; and (3) State Farm's refusal to immediately offer to settle Larry's claim for the policy limits on December 1, 1975, when settlement in that amount was first authorized by State Farm's general claims superintendent. Even assuming the questionable proposition that the first specification *per se* demonstrates a lack of good faith or due care, the analytical framework suggested by the two remaining specifications is utterly useless to the court, for it presupposes a fact not supported by the evidence: that the June 2, 1975, offer to settle Larry's claim remained open throughout the fall of 1975. In the court's view, the facts chronicled at the time of trial suggest but two issues, simply stated: (1) whether State Farm acted negligently or in bad faith in refusing to accept Larry's offer of June 2, 1975, to settle for the policy limits of the insured's coverage; and (2) whether State Farm acted negligently or in bad faith in conducting or failing to conduct settlement negotiations after July 22, 1975.

The court's formulation of the issues is based upon its finding, to which reference was earlier made, that the offer to settle Larry's claim for the policy limits expired on June 24, 1975, or, at the latest, July 22, 1975. Risjord's letter to Rushfelt dated July 22, 1975, can only be interpreted as a revocation of whatever agreement the two attorneys may have had regarding an extension of time within which State Farm could settle Larry's claims by offering the full amount of the policy limits. The only evidence suggesting the continued viability of Larry's demand beyond July 22, 1975, is found in Anne Grether's testimony that Allen and Risjord told her on September 23, 1975, that the offer to settle Larry's claim was still open and that they had so informed State Farm. The suggestion that Larry's offer remained open at that time is simply not credible, however, in view of the following highly contradictory circumstantial evidence: First, Risjord expressly stated on July 22, 1975, that the offer to settle had terminated on June 24, 1975, and there is no evidence that he ever communicated any alleged "renewal" of that offer to Rushfelt or to anyone at State Farm. Second, while Larry's settlement offer had been contingent on both the plaintiffs and State Farm foregoing all discovery under the Federal Rules of Civil Procedure, the plaintiffs' attorneys initiated such discovery on September 4, 1975. (See Rushfelt's conversations with Allen, June 23 and 24, 1975, and with Risjord, June 27, 1975). Third, contrary to what Allen and Risjord allegedly told Grether, by the beginning of October, 1975, neither Rushfelt nor State Farm appeared to believe that Larry's settlement offer was still open. (See Rushfelt's October 3, 1975, status report to Haertling, noting that Rushfelt had requested that Risjord "renew" the $50,000 demand he had previously submitted for Larry Covill; also, Rushfelt's November 19, 1975, status report to Haertling expressing "concern as to whether or not the settlement demand of $50,000 was still open."). Finally, the conduct of Allen and Risjord themselves belies any suggestion that they were proposing settlement of Larry's claims after July 22, 1975. It should be noted that following Risjord's abrupt termination of negotiations in his July 22 letter to Rushfelt, neither Allen nor Risjord ever again took the initiative in settlement overtures regarding the claims of Larry or Jennie Covill. After this July 22 letter was dispatched to Rushfelt, there was no further contact between the Covill attorneys and Rushfelt until August 28, 1975, at which time the subject of settlement negotiations was not even raised by the former.

As noted above, the court's finding that Larry's settlement offer terminated on June 24 or July 22, 1975, requires us to determine whether State Farm breached its

duty to Kenneth Phillips, either by failing to compromise and settle Larry's claims prior to the expiration or revocation of his settlement demand or, alternatively, by failing to independently initiate reasonably adequate and timely settlement negotiations on behalf of its insured. It is to these questions that the court's attention now turns.

### A. STATE FARM'S FAILURE TO ACCEPT OR NEGOTIATE LARRY COVILL'S DEMAND FOR SETTLEMENT DATED JUNE 2, 1975.

The court has little hesitation in concluding that State Farm's rejection of Larry Covill's June 2, 1975, demand for settlement in the amount of the policy limits was made in good faith and with due care and that such conduct, standing alone, provides absolutely no basis for the imposition of excess liability in the circumstances of this case.

By the time State Farm received Larry's demand for settlement, it had investigated the possible brake failure defense of its insured and, having determined that it lacked merit, was approaching the case as one of unquestioned liability. State Farm's refusal to immediately accede to Larry's demand for the policy limits was based solely upon its view that the settlement value of his injuries was less than $50,000. State Farm was aware that Larry Covill had suffered head injuries in the accident and had been hospitalized from April 6 through April 12, 1975. It was further aware that although Larry had experienced generalized seizures shortly after admission, he appeared to be "doing very well" at the time of his discharge. Finally, it had received Risjord's uncorroborated report that on May 30, 1975, Larry had suffered a "severe relapse" and had been re-hospitalized in critical condition with stress ulcers, massive internal bleeding, severe pneumonia, and static seizures. State Farm had no medical information, however, regarding Larry's prior medical history, the probable permanency of his injuries, or whether his injuries were in fact attributable to the accident in question. The bulk of the meager medical records forwarded by Risjord and Allen in support of Larry's settlement demand were piecemeal, largely illegible reports from Larry's initial hospitalization. They were very unenlightening on the questions whether the seizures were caused by the accident, whether Larry had a prior history of seizures, and whether Larry would suffer permanent disability. The one articulable item of medical evidence supplied to State Farm was a letter dated April 14, 1975, from Kenyon K. Kugler, M.D., a neurosurgeon at the University of Kansas Medical Center. In that letter, Dr. Kugler noted (1) that Larry seemed to be "doing very well at this time following his closed head injury with no apparent neurologic deficit except for rapidly improving minimal difficulty with short term memory;" (2) that Larry was "well oriented to person, place, situation and current political events at the time of discharge;" and (3) that Larry was expected to "continue to make rapid and satisfactory recovery" and to have "no difficulty returning to school in the near future." State Farm's first confirmation of Larry's relapse was received on July 24, 1975, contemporaneously with Risjord's July 22 letter terminating the time for acceptance of Larry's settlement demand.

Although neither State Farm nor Rushfelt believed that the above medical records warranted payment of Larry's demand for the policy limits, they did not reject the demand out of hand. Rushfelt instead contacted both Allen and Risjord, requesting additional time for State Farm to evaluate Larry's claim and urging Allen and Risjord to make good their original promise to supply all medical information reasonably necessary to substantiate Larry's claims of injury. (See Rushfelt's conversations with Risjord on May 27 and June 27, 1975, and with Allen on June 23 and 24, 1975). Rushfelt expressly informed Allen of the reasons why State Farm was not convinced that Larry's injuries had a settlement value of $50,000. In response, Allen assured Rushfelt that medical records responsive to State Farm's concerns about the cause, prognosis, and history of Larry's disability would be

forthcoming. Notwithstanding these assurances, and despite additional efforts by Rushfelt on June 27, July 9, and July 10, 1975, to solicit such records, neither State Farm nor Rushfelt received further medical information about Larry's claim until his settlement demand was revoked on July 22, 1975.

In the court's view of the circumstances outlined above, State Farm's failure to accept Larry's demand for payment of the policy limits or to make a bona fide counteroffer can in no way be viewed as a breach of its duty to its insured, Kenneth Phillips. First, State Farm's honest, good faith, and eminently reasonable evaluation of Larry's claim, in which its trial attorney and its insured concurred, was that even if liability were admitted, the nature and extent of the plaintiff's injuries did not substantiate a settlement value of $50,000. Second, in these circumstances the fact that this conclusion rested solely upon information supplied (and perhaps just as significantly, information not supplied) by Allen and Risjord, rather than upon the results of any independent investigation by State Farm, does not demonstrate a default of the latter's duty to fairly investigate claims against its insured. Larry's attorneys had represented from the inception of settlement discussions in May, 1975, that they would provide all medical substantiation of Larry's injuries and that discovery efforts by State Farm would not be tolerated. In these circumstances it was not unreasonable for State Farm, having voiced its reasonable and specific requests for the medical information it felt was necessary to verify the claimant's injuries, to rely upon the assurances of the plaintiff's attorneys that such information would be forthcoming and to forsake that independent investigation which would, under the plaintiff's ultimatum, jeopardize any prospects of settlement. Third, despite the fact that Larry Covill's lawsuit sought $250,000 in damages, the possibility of an excess verdict reasonably appeared remote to State Farm at the time it received the June 2, 1975, demand for the policy limits. Attorney Allen had represented to the insured's father, Dr.

Phillips, on April 7, 1975, that he need not worry about any judgment against his minor son because Larry Covill was interested only in receiving the available insurance proceeds. Further, on May 16, 1975, after the policy limits had been divulged to the plaintiffs, Allen wrote to the insured that the policy limits appeared "sufficient" to cover the injuries sustained by Larry. These representations, in combination with the optimistic medical records suggesting the probability of Larry's complete and satisfactory recovery and the total lack of medical substantiation for the more dismal prospects suggested by Larry's attorneys in late June and July, 1975, gave State Farm reasonable grounds to believe that the possibility of an excess judgment against its insured was remote. Fourth, the minor insured and his parents were informed of all material facts relating to Larry's demand for settlement and both they and their attorney acquiesced in State Farm's judgment that payment of the policy limits was not warranted at the time of the demand. On May 29, 1975, the week after the lawsuit was filed, State Farm advised Kenneth Phillips of the potential for an excess verdict and suggested that he might desire to obtain personal counsel to protect his own distinct interests. On June 9, 1975, Allen personally conveyed to Grether, the Phillips' personal attorney, the substance of Larry's demand to settle for $50,000. This offer was immediately conveyed to the Phillips' and on June 10, 1975, the family met with Rushfelt and discussed with him in great detail the potential for an excess verdict and the need for further investigation and information concerning Larry's claim. On July 1, 1975, Rushfelt wrote Grether a letter outlining Larry's demand for settlement; Rushfelt's understanding that Risjord had agreed to extend the June 20, 1975, settlement deadline to an indefinite date in the near future; the fact that the medical information received to date did not shed any light upon Larry's medical history or the cause or probable permanence of his injuries; and State Farm's request for additional time to verify these facts.

Rushfelt's letter further informed Grether of the filing of an amended complaint raising the prayer for damages on Larry's claim to one million dollars, and invited any comments or response from Grether. The record clearly indicates that although Grether advised the Phillips family to make written demand that State Farm settle Larry's claims within the policy limits, this advice was intended more as a strategic move to protect the Phillips' position than a reflection of a bona fide belief that State Farm should settle on the terms of the June 2, 1975, demand. At the time she prematurely advised the Phillips' to demand settlement, Grether was informed only "in a general way" of the nature of Larry's injuries. Her knowledge was based on second-hand reports by Larry's doctors, as relayed to Dr. Phillips, and the basis for her advice was simply that because a head injury was involved, "the right thing to do" would be to settle the case for the policy limits. Despite repeated invitations to Grether to examine Rushfelt's files and make comments or suggestions regarding State Farm's handling of the case, Grether did not do so. Further, neither she nor the Phillips at any time objected to State Farm's treatment of the case or its conduct of the settlement negotiations. The apparent satisfaction of Grether, Kenneth Phillips, and his parents with the action of State Farm is further evidence of State Farm's good faith in the circumstances. *Moore v. United States Fidelity & Guaranty Company*, 325 F.2d 972 (10th Cir. 1963).

In summary, in all of its handling of Larry's June 2, 1975, demand for settlement, State Farm communicated to Kenneth Phillips all relevant information necessary for him to take proper steps to protect his own interests. State Farm acted upon the corroborated information available to it by inquiry from the plaintiff's attorneys and reasonably forsook independent investigatory measures. It honestly evaluated the plaintiff's claim as one that did not have a settlement value of $50,000, even assuming that its insured was liable. State Farm clearly conducted itself with "that degree of care that would be used by an ordinarily

prudent person in the management of his own business." *Bollinger*, 202 Kan. at 338, 449 P.2d at 511. Finally, the duty to give "equal consideration" to the interests of the insured does not require an insurance company to totally ignore its own interests in the non-payment of seemingly unfounded or exaggerated claims. Here, good faith and due care did not require State Farm to immediately capitulate to the plaintiff's precipitated, uncorroborated demand just because its insured had executed a token demand that it do so. For all of the above-stated reasons the court must therefore conclude that State Farm acted in good faith and with due care in failing to settle or negotiate Larry Covill's June 2, 1975, demand for settlement within the policy limits.

## B. STATE FARM'S CONDUCT OF SETTLEMENT NEGOTIATIONS AFTER JULY 22, 1975.

By the end of July, 1975, State Farm was aware that Kenneth Phillips had no viable defense to liability in the lawsuit filed by Larry and Jennie Covill, and it was increasingly informed of the severity of Larry's physical disabilities. On July 24, 1975, Rushfelt received a copy of a July 16, 1975, letter to Allen from Dr. Zsolt G. DePapp, M.D., who was treating Larry in New York at the time of his relapse on May 30, 1975, and during his subsequent hospitalization. Dr. DePapp's letter described in grim and graphic terms the circumstances of Larry's relapse, *i. e.* that he was found on the floor, covered with blood, convulsing and unconscious; that he was having marked episodes of apnea, leading to cyanosis; that he was convulsing continuously and vomiting large amounts of bloody stomach content; that he suffered significant bilateral pneumonia; that he did not regain consciousness for 24 hours; and that he was hospitalized until June 13, 1975, at which time he was discharged with a prescription to take dilantin four times daily to control his seizures. Dr. DePapp observed that ten days after his discharge Larry still experienced coughing, breathlessness on exertion, phlebitis in his

right forearm, increased fatigability, episodes of memory gaps, and dizziness. In Dr. DePapp's view, one could not predict whether Larry would continue to have seizures; his prognosis had "to remain somewhat unguarded [sic]" until a year had passed from the time of his injury, and he would probably have to stay on medication for at least two years. Dr. DePapp emphasized that Larry's brain wave was still abnormal, that his intellectual functioning was possibly impaired, that the two episodes of pneumonia following the accident had caused scarring of the lung tissue, and that the psychic trauma of such an injury was "totally immeasurable." Dr. DePapp further noted that Larry had never experienced "epileptic-type seizures" before the accident, and he expressed the view that Larry was suffering from "epilepsy brought on by cerebral contusions sustained in his April 6th automobile accident." Dr. DePapp's report was corroborated by Strong Memorial Hospital records contemporaneously furnished to Rushfelt by Risjord, and by the reports of "confidential sources" whom State Farm had engaged to clandestinely elicit information from Jennie Covill. On October 17, 1975, Jennie Covill testified by deposition that Larry had suffered further severe seizures in June, at which time he had been hospitalized for two weeks, and in August, after which time his medication had been increased. Jennie testified that her brother remained essentially inactive and under constant medical care. She also stated that prior to the accident he had been in good health and had not suffered from other seizures or epileptic disorders. Also on October 17, 1975, the plaintiffs' attorneys filed a motion to advance the trial setting of the lawsuit, representing therein that Larry had on that date suffered another seizure that "nearly took his life" and left his life "hanging in the balance." Said motion articulated a desire that the case reach trial while Larry Covill was still living.

Throughout the period from July to November, 1975, when State Farm was increasingly aware of the seriousness of Larry's injuries and was also aware that its insured had no viable defense as to liability, it made no efforts to initiate settlement negotiations concerning Larry's claim. The sole reason advanced for its failure to aggressively take actions calculated to settle the case and protect its insured from a potential judgment vastly exceeding his insurance coverage was that it still entertained serious questions about the extent of Larry's injuries and disability, whether his disability was caused by the accident, whether the disability was permanent, and Larry's medical history. This position, in view of the information known and the information reasonably ascertainable upon investigation, was clearly untenable in the circumstances. For reasons more fully set forth below, the court must conclude that State Farm's "do-nothing" response to a claim of admitted liability, the value of which was becoming inexorably destined to exceed the applicable policy limits, breached its duties of due care and good faith to its insured, Kenneth Phillips.

The most telling evidence of State Farm's failure to give due consideration to the interests of its insured lies in its consistent disregard of Rushfelt's advice that the value of Larry's claim could easily prove to exceed $50,000 and its inexplicable internal delay in evaluating the claim. At the time of the accident State Farm claim procedures gave local "claim committees" discretionary settlement authority up to $50,000 per file (*i. e.* accident), which could be exercised without approval from the home office in Blcomington, Illinois. When a personal injury claim was received by State Farm, it was automatically assigned a "reserve factor" based upon the amount at which average claims for the preceding year were closed. At the time of the accident, the automatic reserve factor for a personal injury claim in a potential excess judgment case was $7,500. After 30 days, or sooner if additional information was earlier obtained, this automatic reserve factor was to be reviewed and adjusted to reflect an "actual" or "meaningful" reserve. This actual reserve figure was to represent the figure State Farm thought the claim was

"actually worth," and that sum was earmarked and set aside to pay the claim. Actual authority to settle a claim for a particular amount derived from the local claims committee, a meeting of which was to be initiated by the claim superintendent for the file (here, Melbert Haertling). According to the State Farm Claims Superintendents' Manual, claims committee meetings were to be called (1) "as soon as it [was] time to make an offer;" (2) when the value of the claim exceeded the personal settlement authority of the claims superintendent (in this case, Haertling's authority was $5,000 for one claim or $7,500 for all personal injury claims in one file); or (3) "at any time the insured demands settlement within policy limits." Preparatory to the claims committee meeting, the claims superintendent was to prepare a report presenting the history of the claim, relevant reserve figures, and "a condensed summary of the ultimate and crucial facts and any controversies in the evidence," together with the attorney's recommendation regarding the valuation of the claim. The claims committee, chaired by the divisional claim superintendent (here, Dick Scott), was authorized to make a "final" decision as to settlement authority up to $50,000 per file, or in the alternative, to render an "advisory" decision for further action by the Home Office Claim Committee.

In this case, despite the insured's demand for settlement within the policy limits on June 10, 1975, the local claims committee was not convened until November 25, 1975. It is totally unclear what steps, if any, State Farm was taking to evaluate Larry Covill's claim in the intervening six months. As noted earlier, in early July, 1975, State Farm and Rushfelt thought it "doubtful" that the value of Larry's claim approached $50,000 in view of his favorable prognosis upon discharge from the University of Kansas Medical Center in April. Nevertheless, on July 7, 1975, State Farm increased its reserve to $35,000 for the combined claims of Larry and Jennie Covill. (Jennie had suffered a cerebral concussion, multiple lacerations and abrasions, the loss of four front upper teeth, and destruction of the frontal part of the jaw bone.) On July 25, 1975, Rushfelt reported to Haertling his view that hospital medical records recently received from Risjord confirmed the existence of Larry's epileptic seizures, pneumonia, and other complications, and corroborated Dr. DePapp's earlier report. Rushfelt suggested that this information should assist Haertling's continuing evaluation of the claims.

On October 3, 1975, Rushfelt—greatly concerned about the mounting evidence of the seriousness of Larry's injuries and State Farm's relative inaction to date—wrote Haertling a letter that concluded, "As before indicated, from the materials we have submitted to you and with the recognition of the brake defense as weak, we are of the opinion that the claim of Larry Covill will prove to have a value of $50,000, if not more. Accordingly, we recommend that you pursue whatever procedures are necessary to expedite authority in that direction." For three weeks Haertling took no action in response to this letter because he personally entertained serious doubts about whether Larry's disabilities had been caused by the accident and because he was not worried about expediting the claim since he understood that Larry's offer to settle had been withdrawn in July. By October 24, 1975, however, Haertling indicated to Rushfelt that he was reviewing his files preparatory to completing the claims committee reports. However, he had been "holding up" in the hope that he would receive a settlement demand from Jennie Covill, so that both claims could be evaluated at the same time. On November 11, 1975, State Farm's reserve for the combined claims of Larry and Jennie was adjusted from $35,000 to $75,000. Neither Grether nor Rushfelt was informed of this fact. By November 19, 1975, Rushfelt—who was still awaiting word of State Farm's decision to expedite settlement authority pursuant to his request seven weeks earlier—again wrote Haertling and noted that all of the materials received to date corroborated each other to support a serious claim of injury and damages of "substantial total

value." Rushfelt concluded, "As we have suggested in previous communication, we are of the opinion the claim of Lawrence Covill has a settlement value in an amount of at least $50,000. If the case is tried, I believe a judgment could exceed that amount."

The following week, on November 25, 1975, Haertling arranged for a meeting of the local claims committee. Haertling's claim committee report, which summarized the relevant facts of the accident, made no reference to any potential evidentiary conflicts or any alleged need for further medical information preliminary to satisfactory evaluation of the claims. It did recite the recommendation of both Haertling and Rushfelt that settlement authority for Larry's claim be set at $50,000. The claims committee reached an "advisory" decision to authorize settlement of Larry's and Jennie's claims at $40,000 and $15,000, respectively, from the previously established combined reserve figure of $75,000. This advisory decision was forwarded to the home office general claims division which on December 1, 1975, authorized payment of $50,000 and $25,000 to settle the respective claims of Larry and Jennie and left the use of such authority to local discretion. State Farm did not inform Rushfelt that the foregoing settlement authority had been obtained until December 9, 1975. At that time, Dick Scott told Rushfelt about the $50,000 authority on Larry's claim but noted his doubt that the claim was worth $50,000. Scott questioned whether it would be unreasonable to withhold any offers until State Farm had completed its scheduled deposition of Larry on December 16, 1975, and received the results of a neurological examination of Larry scheduled to be taken on December 17, 1975. In response, Rushfelt again expressed his view that Larry's claim would prove to be worth $50,000 or more if his allegations were true. Rushfelt agreed, however, that it would not be unreasonable to delay settlement negotiations until the deposition and medical examination results were available.

State Farm's consistent disregard of Rushfelt's advice to offer to settle Larry's claim for $50,000 continued until January 21, 1976, five days before trial. On January 12, 1976, six weeks after the local State Farm office had been authorized to settle Larry's claim for $50,000, Haertling authorized Rushfelt to offer $40,000. Rejection of this offer prompted Rushfelt on January 19, 1976, to again urge Haertling to offer the full $50,000 limits on Larry's claim. Haertling refused to do so, but suggested that Rushfelt try to solicit a settlement demand from Larry. As leverage to procure such a demand from Larry, Haertling further instructed Rushfelt to condition the closing of pending settlement negotiations on Jennie's claim on the settlement of Larry's claim. At this point, the trial was scheduled for six days hence and Haertling promised to confer with Dick Scott about extending authority to settle Larry's claim for $50,000. Despite Rushfelt's urging that this be done "as soon as possible," Haertling waited two and a half days until it became apparent that State Farm's ploy to elicit a demand for Larry was not going to work before he authorized Rushfelt to settle Larry's claim for $50,000.

The circumstances clearly demonstrate that by November 7, 1975, State Farm thought that Larry's and Jennie's combined claims were worth $75,000 and that by the end of December, 1975, Rushfelt had three times advised Haertling that Larry's claim was worth "at least $50,000" and urged him to expedite settlement authority. Nevertheless, State Farm's first and perhaps only plausibly legitimate offer to settle Larry's claim, in the amount of $40,000, was not extended until January 12, 1976, two weeks before trial. State Farm's earlier offer of $30,000, which was extended on November 28, 1975, was $20,000 or 40 per cent short of State Farm's own evaluation of the claim and was apparently intended not as a bona fide offer but merely as a fishing expedition to see whether Larry would "bite." Although Rushfelt did not receive written rejection of this offer until January 6, 1976, it is clear that he and Haertling construed Risjord's "that won't quite do it" comment on November 28, 1975, as a final rejection

of the proposal. Haertling and Scott nevertheless refused to authorize any second offer until nine weeks after State Farm had established its $75,000 reserve for the file, six weeks after Risjord's rejection of November 28 offer, six weeks after the home office authorized settlement of Larry's claim for $50,000, and two weeks before trial. Furthermore, State Farm's good faith in offering the $40,000 figure finally authorized on January 12, 1976, can perhaps be questioned in view of the fact that it was a direct response to its receipt of an oral report of Dr. John A. Segerson, M.D., regarding the results of State Farm's eleventh-hour examination of Larry at the Menninger Clinic in Topeka, Kansas. Dr. Segerson's oral report on January 9, 1976, confirmed that Larry had suffered recurring convulsive seizure disorders and a mild organic brain syndrome, that his disabilities were caused by the accident, that they were permanent in nature, and that Larry had no prior history of seizures. The $40,000 offer for Larry, together with an outstanding offer to Jennie of $12,500, were rejected on January 16, 1976, in a letter by Risjord that concluded, "if you have any further authority for either claim, please extend it to us now before we must incur expenses for transporting out-of-town doctors to trial." By the time State Farm received Risjord's letter, it had received a written report from Dr. Segerson that not only corroborated his earlier oral report but even more strongly emphasized his projection of permanent disability and his opinion of Larry's probable inability to pursue his intended profession. State Farm nevertheless responded to Risjord's solicitation of a higher offer by telling Rushfelt to solicit an offer from Risjord. State Farm further instructed Rushfelt to condition the pending negotiations of Jennie's claim upon settlement of Larry's claim. This transparent elevation of negotiation form over substance was extended in the form of an "offer" on January 19, 1976, and it quickly withered on the vine as it became apparent that Larry's attorneys were not responsive to State Farm's attempted finesse. At that point State Farm, having virtually no remaining options and facing trial some five days hence, determined to "accept" Larry's June 2, 1975, offer to settle for $50,000. Such "offer" by State Farm was rejected by Risjord on January 22, 1976. Although this rejection essentially terminated the alleged "settlement negotiations" by State Farm, it should be noted that the insured and his parents were understandably greatly alarmed when Larry refused to accept $50,000 to settle his claim four days before trial. On January 23, 1976, the insured's father inquired of Rushfelt whether there was a danger of excess liability on the part of Kenneth Phillips in light of the Phillips' written demand for settlement by State Farm on June 10, 1975. When Rushfelt advised Dr. Phillips that submission of the written request did not automatically immunize Kenneth from excess liability exposure, Dr. Phillips suggested a meeting of himself, Haertling, and Rushfelt to discuss the possibility of adding a financial contribution by Kenneth personally in order to increase the settlement offer beyond the policy limits. On being informed of this suggestion later that day, however, Haertling rejected it out of hand as being "utterly useless" because State Farm could not authorize payment of more than $50,000 and no settlement demand had been received from Larry Covill.

Under *Bollinger v. Nuss, supra,* an insurance company is required to exercise good faith and due care for the interests of its insured in rejecting any demand for settlement within the policy limits. *Rector v. Husted, supra,* seemingly extends this holding to require, at least in admitted liability and permanent disability cases involving a potential excess judgment, that an insurance company make good faith efforts to initiate settlement negotiations. Application of this relatively simple principle to a case in which the plaintiff has made no demand for settlement and has eschewed the process of negotiation by refusing to submit counter-offers is, however, fraught with great difficulty. Unfortunately too, any settlement offer, viewed from the hindsight perspective of a high verdict, inevitably tends to be colored thereby and look

disproportionately low. The court is nonetheless persuaded that in the circumstances present here, State Farm did not exercise due care and good faith in protecting the interests of its insured.

First, there is compelling evidence that by early November, 1975, State Farm did not believe and could not have honestly believed that it had a realistic chance of defeating Larry Covill's claim or keeping any possible judgment within the limits of the policy. Furthermore, the evidence strongly suggests that if State Farm had more aggressively investigated Larry's claim instead of relying past the point of all reason on Risjord and Allen to voluntarily furnish all of the information allegedly necessary for adequate evaluation of the claim it would have known much earlier than November, 1975, that the risk of an excess judgment was great. Had State Farm earlier undertaken a diligent search for all relevant information "ascertainable by inquiry or investigation," it would have been in an unquestionably superior position to protect the rights of its insured.

■ Second, one must conclude that State Farm fell far short of giving equal consideration to its own interests and those of its insured. Numerous defaults by State Farm may be cited in this regard. It absolutely strains credibility to suggest that if State Farm were to have been ultimately liable for the entire amount of the judgment, it would have waited until so late in the legal proceedings to have initiated settlement negotiations and then to have adopted in fact the transparent brinkmanship approach that it did. State Farm's Claims Superintendents' Manual counsels with reference to settlement negotiations that the adjuster should "horsetrade with every trader," "hold back the last few dollars to get or make a final concession," and not initiate an offer if none has been presented by an opposing attorney. These policies, to which Haertling and Scott religiously adhered in this case, may represent good negotiating strategy in a non-excess case. Yet they ill serve the insured's interests in a case in which there is a high

probability of an excess judgment. Many of the negotiating tactics adopted by State Farm in this case either served only its own purposes (e.g., conditioning settlement of Jennie's clearly non-excess claim upon settlement of Larry's obvious excess claim; failing to offer to settle Larry's claim for $50,000 until a time long after State Farm had itself valued his claim at that amount) or served no discernible purpose at all, except perhaps gamesmanship (e.g., soliciting a further demand from Larry on January 1, 1976, instead of offering forthright the amount which State Farm was undeniably willing to pay). The court cannot believe that any prudent and reasonable person would so manage his own affairs in the circumstances. The best that can be said of the consideration which State Farm gave to interests of its insured is that it perhaps felt that his interests were already adequately protected by the fact that he was for all practical purposes "judgment-proof." State Farm was well aware that Kenneth Phillips, a high school student, had no income, property, or other assets subject to garnishment or attachment, and Rushfelt had discussed with Dr. Phillips on several occasions the availability of bankruptcy proceedings for Kenneth if "necessary or otherwise adviseable." This case therefore was essentially different from a typical case such as *Rector v. Husted,* where "the insurer has a great deal less to risk from going to trial than does the insured, because the extent of its potential liability is fixed." Here, the insurer had a great deal *more* to risk by going to trial than did the insured, for the enforceable liability of the latter was potentially fixed by law at nothing. From State Farm's point of view, if its insured were protected by law from the execution of any excess judgment, the decision to hold back until the eve of trial the "last few dollars" (here $10,000—$20,000), may have appeared to be a reasonably calculated gamble. Nevertheless it was not one that State Farm, consistent with due care and good faith, could take. The court is aware of no cases espousing a sliding scale of insurance company responsibility depending upon the status or circumstances

of the insured. If such a standard were employed, one might suspect that a more solicitous and exacting duty of care would be owed to minor insureds and other particularly vulnerable persons financially incapable of bearing any excess judgment whatsoever. An insurance company's assessment that its insured is judgment-proof, however, has no valid role in a decision to forsake settlement negotiations in a case of admitted liability, permanent disability, and a high probability of a large excess judgment.

Third, it is questionable whether either of State Farm's actual offers of November 28, 1975, or January 12, 1976, or its "quasi"-offers of January 19 and 21, 1976, can be characterized as bona fide. The first offer was clearly insufficient in amount, both in relationship to State Farm's own reckoning of the value of the claim and in its ability to attract the plaintiff's interest in further negotiations. The remaining overtures, while not insubstantial in amount, were both too little and, more importantly, too late.

In summary, it appears that State Farm was informed of both the strength of Larry Covill's case as to liability and damages and the high probability of an excess judgment against its minor insured. It nevertheless failed to make a timely and sufficient investigation of the claim; rebuffed suggestions by the insured's father that the possibility of settlement in an amount including a personal contribution from the insured be explored; consistently and inexplicably ignored the sound and experienced advice of Rushfelt, its legal counsel; and wantonly exposed its insured to a financial risk that notwithstanding the availability of bankruptcy proceedings was wholly incommensurate with the risk shouldered by State Farm and with the maximum degree of potential savings to State Farm. State Farm's conduct did not evidence that honesty and fair dealing upon adequate information that the "good faith" standards of *Bollinger v. Nuss* require.

In holding that State Farm is liable for the excess judgment rendered against its insured, the court by no means implies that the garnishor's attorneys, who represented the plaintiff in the principal action, are deserving of laurels or accolades. It is extremely questionable whether their June 2, 1975, settlement demand on Larry's behalf can be viewed as a bona fide, good faith offer; it more accurately appears to have been a precipitous bluff, conditioned upon acceptance within an inordinately short period of time and a demand for forbearance from discovery deliberately calculated to ensure that State Farm remained unaware of Larry's medical history, prior psychiatric problems, experiences with communal living, and extensive drug usage. On several occasions the plaintiffs' attorneys ordered destroyed or revised medical records that they viewed as damaging to Larry's case. In several instances they were less than candid in answers to interrogatories concerning Larry's medical treatment and prior history. Risjord's emphatic refusals to produce Larry for medical examination or deposition without a court order gave Rushfelt and State Farm reasonable and serious grounds to believe that the true facts of the case were not those represented by the plaintiffs' attorneys. Finally, the conduct of Risjord and Allen gave Rushfelt and State Farm good cause to believe, and they did believe, that the plaintiffs' attorneys had embarked upon the calculated course of building an excess case against State Farm. This reprehensible conduct is not particularly relevant to the instant garnishment action except insofar as it may perhaps shed some light upon the reasons for State Farm's intransigence in the matter of initiating settlement negotiations in a timely and bona fide manner. The point to be made, however, is that in the distrust and acrimony generated in the principal case, State Farm lost sight of the distinct and weighty obligations of due care and good faith that it was required to satisfy with reference to its minor insured.

Accordingly, for all of the above reasons, the court holds that the garnishee State Farm Mutual Automobile Insurance Company is liable to the garnishor Lawrence B.

Covill for the amount of the judgment in excess of policy limits rendered in *Covill v. Phillips,* Case No. 75–103–C2, on February 3, 1976.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that counsel for the garnishor prepare, circulate, and forward for the court's approval and signature a Journal Entry of Judgment reflecting the holding of the foregoing Memorandum and Order.

## ON MOTION FOR AMENDMENT

This case comes now before the court for determination of the garnishee's motion for amendment of the court's Order of March 27, 1978, in which State Farm Mutual Automobile Insurance Company was held liable to Lawrence B. Covill for amounts in excess of the policy limits on the judgment rendered against State Farm's insured, Kenneth Phillips, in the principal action herein. The gist of the instant motion is that the court's imposition of liability was improper because there was no direct evidence at trial that "had garnishee made an offer of the policy limits before January 22, 1976, the plaintiff would have accepted." According to State Farm, the "necessary element of proximate cause" was therefore not proven.

The answer to State Farm's contentions is two-fold. First, the court must reject the suggestion that as a matter of law excess liability can only be sustained where there has been "direct" testimony (by either the plaintiff or his attorneys) that an offer at or within the policy limits would have been accepted if timely made. Second, State Farm overstates the quantum of proof of proximate cause that is required in excess cases such as this. *Coleman v. Holecek,* 542 F.2d 532 (10th Cir. 1976), is instructive of the Kansas law on this point. In that case, the Tenth Circuit Court of Appeals found that (1) a judgment greatly in excess of the policy limits "might" easily have been avoided if the insurer had not made an untimely withdrawal from "embryonic" settlement negotiations, and that (2) the insurer could have and should have

continued negotiations even though the plaintiff had never submitted an offer of settlement, in order to avoid prejudicing the interests of its insured. In holding that the insurance carrier was liable in such circumstances for a $203,000 excess verdict, the Tenth Circuit pointedly rejected the precise claim that is raised by State Farm in this case. The court aptly stated:

> "Although we cannot be absolutely sure that the continuation of the settlement negotiations would have led to a settlement in an amount less than the judgment ultimately entered, Allstate had at its disposal the means of eliminating this uncertainty by continuing the negotiations under a reservation of rights. It failed to follow this sensible course and as a result must bear the full responsibility for the judgment ultimately imposed." 542 F.2d at 538 n.7.

The Tenth Circuit's comments are equally applicable to the present case and are dispositive of the garnishee's arguments. Accordingly, for the reasons stated above, we conclude that the garnishee's motion for amendment of judgment lacks merit.

IT IS THEREFORE ORDERED that the motion of State Farm Mutual Automobile Insurance Company for amendment of the court's Order of March 27, 1978, be and hereby is overruled. Counsel for garnishor is directed to prepare, circulate, and forward for the court's approval and signature a Journal Entry of Judgment reflecting the holding of the foregoing Memorandum and Order.