Ruby LUPTON, Administrator of the Estate of Lois Elaine Laptad, Deceased, Appellant and Cross-Appellee,

v.

Peter TORBEY, Appellee and Cross-Appellant.

Nos. 75–1775, 75–1776.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Aug. 24, 1976.

Decided Jan. 18, 1977.

Gerald L. Michaud, Wichita, Kan. (Montie R. Deer, Michaud & Cranmer, Wichita, Kan., with him on the brief), for appellant and cross-appellee.

Lawrence McDonough, Wichita, Kan. (Emmett A. Blaes, Jochems, Sargent & Blaes, Wichita, Kan., with him on the brief), for appellee and cross-appellant.

Before HILL, SETH and McWILLIAMS, Circuit Judges.

SETH, Circuit Judge.

This is a personal injury action initially brought by Lois Elaine Laptad, by her husband, Robert P. Laptad as guardian, seeking damages for her brain injury suffered during a diagnostic medical procedure. The defendants were the anesthesiological team (Drs. Fieldman, Martin, and Tinterow, and Mr. Mohan, CRNA), the referring general physician (Dr. Stewart), the radiologist (Dr. Torbey), the hospital (Wesley Medical Center), and the manufacturer of the anesthetic drug (McNeil Laboratories, Inc.). Recovery was sought for the injuries and damages to Lois Laptad and Lois Laptad on behalf of her husband for loss of consortium, comfort, services, and society.

Prior to trial Robert and Lois Laptad were divorced; the anesthesiological team was dismissed from the suit after paying $300,000.00 in settlement; and the hospital was dismissed after paying $75,000.00. The pretrial order dismissed at plaintiff's request the claim for loss of consortium. It also substituted the First National Bank and Trust Company of Joplin, Missouri, as conservator. Trial to a jury began on October 15, 1974. A mistrial was declared a month later when the jury failed to reach a verdict. Retrial began May 3, 1975, and continued to July 14, 1975, when the jury rendered a general verdict for the plaintiff, and against Dr. Torbey, the only remaining defendant, in the amount of $750,000.00.

Dr. Torbey's motions for new trial and judgment n. o. v. were denied, but the court granted his motion for a reduction of the verdict by allowing credit for all previous settlements, which amounted to $375,000.00.

Mrs. Laptad's administrator, as appellant, now appeals the reduction of the jury verdict. Dr. Torbey cross-appeals as to certain jury instructions, and the denial of his motion for a directed verdict.

The record shows that Lois Laptad was a thirty-seven year old woman with a medical

history of stomach pain and difficulties with her digestion which had resulted in several hospitalizations. Her physician, Dr. J. T. Stewart, diagnosed her problems as arising from a constriction of the artery which supplies blood to the stomach. To test the diagnosis, he had Lois Laptad admitted to the hospital for a celiac axis study. Dr. Peter Torbey, a board certified radiologist, was to carry out the procedure. The evening before the test, he visited Mrs. Laptad to discuss the procedure, and at this time she requested general anesthesia. Dr. Torbey arranged to have Dr. E. J. Fieldman, a board certified anesthesiologist, administer the anesthesia during the procedure.

The next morning, Mrs. Laptad was given the preoperative medication prescribed by Dr. Fieldman and was then taken to the radiology department of Wesley Medical where the procedure was to be conducted. There, Dr. Torbey examined Mrs. Laptad and then left the room for about a half hour, tending to his other patients. Under Dr. Fieldman's supervision, his employee, Mr. Mohan, a certified registered nurse anesthetist (CRNA), and Miss Sherry Reese, a registered nurse studying to be a CRNA, began administering Innovar, the drug selected as the anesthetizing agent for the procedure. There is some evidence that the drug solution was prepared in a much heavier dosage than that recommended by the drug manufacturer. Dr. Fieldman left the room to go to his office one floor above. Mohan and Reese continued to observe Mrs. Laptad, although they monitored neither her breathing nor her pulse. Dr. Torbey reentered the room, checked Mrs. Laptad's femoral pulse, which was normal, and went to scrub, gown, and arrange his instruments. This took five to ten minutes, and during this time, Mohan became disturbed at the rapidity at which Mrs. Laptad had "gone under." He then left the room to talk to Dr. Fieldman, leaving Reese to manage the anesthesia. Neither Mohan nor Reese advised Dr. Torbey of their alarm, having been instructed not to disturb the surgeons about anesthesiological problems.

Dr. Torbey began the planned diagnostic procedure by nicking the skin in the area of the femoral artery where he planned to insert a needle and catheter. In feeling for the artery, Dr. Torbey became concerned about the patient's pulse as it had diminished to a degree where he could no longer feel it. It is at this point the witnesses differed in their accounts of Dr. Torbey's participation. It is clear, however, that Mrs. Laptad's pulse and blood pressure caused alarm to both Dr. Torbey and Reese. Reese immediately gave Mrs. Laptad a drug injection to increase blood pressure and gave her oxygen. It is unclear if these actions were taken in response to orders from Dr. Torbey or on her own initiative. Dr. Torbey himself did not give cardiac massage, take any other emergency steps, or examine the patient. Dr. Fieldman returned, and emergency procedures were started.

There is some evidence that Mrs. Laptad was without a pulse or blood pressure for five to ten minutes. It is during this interval that the brain damage which rendered Mrs. Laptad semicomatose apparently occurred. She remained in that condition at the time of the second trial some seven years later. Some time after the conclusion of the second trial, she passed away.

The cross-appeal raises several issues, but the only issue presented by appellant in her appeal involves the credit applied by the trial court against the jury's award. That credit, for $375,000.00, represents the total amount of pre-trial settlements received by Lois Laptad and her husband from the anesthesiological team and the hospital, as above described. Appellant here disputes only that portion of the credit corresponding to the amounts allocated in each settlement to Robert Laptad for his loss of consortium. Since the loss of consortium claim was dismissed prior to the trial by jury, appellant argues that the amounts allocated in each settlement agreement as payment for the loss of consortium claim should not be subtracted from the general jury verdict against Dr. Torbey. Thus appellant main-

tains that the verdict was only for Lois Laptad's personal injuries.

The covenant not to sue signed by Robert Laptad in his capacity as guardian and conservator upon the anesthesiological team's payment of $300,000.00 states:

"It is further agreed that $200,000.00 of the $300,000.00 payment described herein shall be applied to and is in settlement of the cause of Lois Elaine Laptad in her own behalf and $100,000.00 of said $300,000.00 payment described herein shall be applied to and is for the cause of action of Lois Elaine Laptad brought for her husband Robert P. Laptad."

Also in the covenant not to sue signed by Robert Laptad after Wesley Medical Center's payment of $75,000.00, the parties agreed:

". . . [P]ayment by the defendant, The Wesley Medical Center, . . . of the total sum of Seventy-Five Thousand Dollars ($75,000.00) to be applied $50,000.00 for the cause of action of Lois Elaine Laptad and $25,000.00 for the cause of action of Lois Elaine Laptad on behalf of Robert P. Laptad, her husband . . ."

■ As this is a diversity action, we must look to state law to determine the significance of these releases. Under Kansas law, the effect of a discharge or release of one tort-feasor on the liability of another is to be determined by the intentions of the parties manifested by the instrument. *St. Paul Mercury Indemnity Co. v. United States*, 201 F.2d 57 (10th Cir.). In the cited case, the principle was applied to determine the liability of different tort-feasors as to the same claim.

The language of the covenants clearly did not release any other tort-feasors, but rather each covenant reserved the right of Mrs. Laptad to proceed against any and all other defendants in the suit. The intent of the parties, taking the covenants at face value, is not to release the other tort-feasors. Appellant does not argue that the settlement amounts specifically allocated as damages to Lois Laptad, individually, should not be applied as credit, but instead urges that

such payments should only reduce the award to the extent the covenants state that they are received as damages on her own behalf, thus excluding the portions allocated to Robert Laptad as in settlement of the "cause of action of Lois Elaine Laptad brought for her husband Robert . . ." This is for loss of consortium.

Following the settlements, and prior to the trial of the causes of action asserted against Dr. Torbey, the claim for loss of consortium was dismissed. No evidence on such claim was introduced.

Dr. Torbey, the appellee as to this issue of what should be applied against the jury award, urges that the entire amount paid in settlement with other tort-feasors should be credited on the award. Thus he argues that the action of the trial court was correct.

■ It is apparent that the tort-feasors who settled prior to trial would have no particular interest in how the total amounts they paid were allocated between Robert Laptad and Lois Laptad. At the negotiations for settlement, Robert Laptad was the guardian for Lois, an incompetent, who was then his wife. The allocation between Robert and Lois was a matter which Robert had to decide. This allocation was then recited in the settlement agreement. Any tort-feasors, other than those then settling, had no part, nor authority, nor say in the total settlement nor in the allocation. The record is silent on any participation by Dr. Torbey, and it must be assumed he had none, as the trial court observed. Also the record here contains no facts whatever relative to the damages for loss of consortium. Under these circumstances, the trial court had no alternative but to consider the settlement amounts as a total figure for all causes then asserted. The plaintiffs and the settling tort-feasors could not by agreement bind Dr. Torbey by such an allocation or division. The plaintiff made no claim for loss of consortium in the cause asserted at trial against Dr. Torbey. The plaintiff thus did not wish to put on evidence to show any damages to support such a claim. This, as

indicated above, left the trial court without facts upon which to make an allocation, as was apparently intended by plaintiff. Under these circumstances, the entire settlement amount had to be applied against the general verdict of the jury.

Under Kansas statutory and decisional law, the wife who is injured can bring an action for her personal injuries and may include therein a claim for loss of consortium, "for the benefit of her husband so far as he shall be entitled thereto . . ." K.S.A. § 23–205; see also Hoffman v. Dautel, 192 Kan. 406, 388 P.2d 615; Cornett v. City of Neodesha, 187 Kan. 60, 353 P.2d 975; Foster v. Kopp, 151 Kan. 650, 100 P.2d 660; Criqui v. Blaw-Knox Corp., 318 F.2d 811 (10th Cir.), a Kansas case, and Montgomery Ward & Co. v. Callahan, 127 F.2d 32 (10th Cir.), a case arising in Kansas. The damages in Kansas are thus recovered by the wife for the benefit of the husband. The husband does not have a separate cause of action. Thus again the unilateral division of the settlement does not represent a division between a cause of action for the husband and a separate cause for the wife. The allocation had no basis in fact as far as this litigation is concerned and cannot be recognized, other than as a total amount. This is, of course, what the trial court did.

Appellee Torbey in his cross-appeal challenges the giving of instructions to the jury as to the use of the cardiac monitor during the procedure, and also on the selection of the anesthetizing drug. Appellee argues it was not his duty to decide whether the cardiac monitor should have been used, nor was he responsible for the selection of the anesthetizing agent, and therefore the court committed error in instructing the jury on these issues.

It is settled that the giving or denial of instructions in a diversity action is tested under federal laws and federal rules. Chavez v. Sears, Roebuck & Co., 525 F.2d 827 (10th Cir.); Smith v. Mill Creek Court, Inc., 457 F.2d 589 (10th Cir.). Under the rule in this Circuit, a party is entitled to an instruction on his theory of the case only if the theory is supported by competent evidence. Hartman v. Miller Hydro Co., 499 F.2d 191 (10th Cir.). Stated another way, the evidence introduced at trial must warrant the giving of an instruction. Hopkins v. Metcalf, 435 F.2d 123 (10th Cir.).

In reviewing the record, the issues were raised and there is sufficient evidence to justify the giving of the instructions that are here in dispute. No error was committed.

A related issue raised by appellee in his cross-appeal involves a limiting instruction on the consent form signed by Mrs. Laptad prior to the procedure. The instruction was given as a response to a written question sent out by the jury during its deliberations. The question read:

"3. Does the document entitled Consent for Operation or Other Procedure, have any bearing on the case, specifically item # 2 and # 5 that gives Mrs. Laptad's consent to the use of any anesthesia that Dr. Fieldman decided to use." (Appellee's Brief, p. 33, citing R. Vol. 25, p. 155).

The court responded to this question by instructing the jury that the consent could be considered to corroborate appellee's testimony that he had visited Mrs. Laptad the night before the procedure to discuss it with her. Dr. Torbey urges on appeal that the consent should have been given much broader effect than the instruction permitted. However, Dr. Torbey at trial did not raise the defense that the consent acted as a bar to Mrs. Laptad's claim, nor that the document released all medical personnel involved in the procedure from any liability. Yet such a defense appears to be the basis on which appellee's challenge of the instruction is based. On this record, an instruction which would have allowed the jury to consider the theory that the consent might act as a bar would have been outside the issues and without evidence to support it. The trial court thus properly limited the consideration of the consent by the jury and no error was committed.

The final trial error urged by appellee Torbey is the denial of his motion for a

directed verdict. He argues the evidence established only the liability of the anesthesiological team, and no liability on his part.

The discretion of the court in directing or refusing to direct a verdict is also tested by federal law. *Weeks v. Latter-Day Saints Hospital*, 418 F.2d 1035 (10th Cir.). Under the standards in this Circuit, the test to determine whether a trial court abused its discretion in granting or denying the motion of a party for a directed verdict of course requires the reviewing court to consider the evidence in the light most favorable to the party against whom the motion is made. *Percival Const. Co. v. Miller & Miller Auctioneers*, 532 F.2d 166 (10th Cir.); *Gulf Insurance Co. v. Kolob Corp.*, 404 F.2d 115 (10th Cir.).

Here the trial court found the evidence to present sufficient conflict as to the liability of appellee to require the ultimate determination to rest with the jury. The record demonstrates that the trial court acted well within its discretion, and committed no error in denying appellee's motion for a directed verdict.

AFFIRMED.