INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,

v.

The MEDICAL PROTECTIVE COMPANY, Defendant.

Civ. A. No. 77–4073.

United States District Court, D. Kansas.

Aug. 4, 1983.

Robert M. Siefkin, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., Eugene B. Ralston, Ralston, Frieden & Weathers, P.A., Topeka, Kan., James R. Hanson, Kenneth P. Stewart, Boyer, Donaldson & Stewart, Wichita, Kan., for plaintiff.

Lee H. Woodard, Woodard, Blaylock, Hernandez, Pilgreen & Roth, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This dispute between two insurance companies follows the successful prosecution of a medical malpractice action in 1975. Plaintiff seeks actual damages, interest and attorneys' fees for defendant's lack of good faith and negligence in failing to negotiate a settlement in the underlying malpractice action. This matter was tried to the court, and, after due consideration of the evidence and the briefs and arguments of counsel, the court finds for plaintiff. This memorandum and order shall constitute the findings of fact and conclusions of law of the court.

The events giving rise to the underlying lawsuit may be briefly summarized. In April, 1969, Mrs. Lois Laptad was a married, thirty-seven (37) year old mother of two, who suffered from stomach pain and related complaints. On April 29, 1969, she entered the Wesley Medical Center in Wichita, Kansas, for a diagnostic test of the arteries which supplied blood to her stomach. Dr. Peter Torbey, a radiologist, was to carry out the procedure. Dr. E.J. Fieldman was to administer a general anesthetic during the procedure.

On the day of the procedure, Dr. Fieldman supervised Mr. Mohan, a Certified Registered Nurse and Anesthetist, and Ms. Reese, a student anesthetist, in the administration of Innovar, the anesthetizing agent which had been selected for the procedure. There was evidence that the Innovar solution administered to Mrs. Laptad was prepared in twice the dosage recommended by the drug manufacturer. After the drug had been administered, Dr. Fieldman left the room and returned to his office one floor above. Mr. Mohan and Ms. Reese continued to observe Mrs. Laptad, although neither of them monitored her breathing or pulse.

Dr. Torbey entered the room and checked Mrs. Laptad's pulse, which was normal. Dr. Torbey then left to prepare for the radiological procedure. During Dr. Torbey's preparation, Mr. Mohan became aware that Mrs. Laptad had entered an unusually deep state of anesthesia. Mr. Mohan left the room to find Dr. Fieldman, thus leaving Mrs. Laptad alone under the care of Ms. Reese, the student anesthetist.

At this point, Dr. Torbey returned and began the diagnostic test by preparing to insert a needle and catheter into Mrs. Laptad's femoral artery. While manipulating the artery, Dr. Torbey realized that Mrs. Laptad had no pulse. Both he and Ms. Reese became alarmed. Ms. Reese began to administer oxygen to Mrs. Laptad and gave her a drug injection to increase her blood

pressure. Dr. Torbey did not give cardiac massage or take any other emergency steps or examine the patient. Dr. Torbey was of the opinion that he, a radiologist, should not involve himself in anesthesiological problems, even though he was the only physician in the room. Dr. Fieldman returned and began immediate emergency procedures.

Mrs. Laptad was without a pulse or blood pressure for between five and ten minutes. She never again regained full consciousness.

By and through her legal guardian, Mrs. Laptad commenced a lawsuit in February, 1970, against Dr. Fieldman, Dr. Torbey, the Wesley Medical Center, Mr. Mohan, McNeil Laboratories, Inc., Drs. Tinterow, Martin and Stewart. McNeil Laboratories was the manufacturer and distributor of Innovar. Drs. Tinterow and Martin were Dr. Fieldman's employers, and Dr. Stewart was Mrs. Laptad's personal physician, who recommended the diagnostic procedure which injured her. The case was tried to a jury in October, 1974, but a mistrial was declared nearly a month later when the jury announced it could not reach a verdict. The case was retried in May, 1975. In July, 1975, the jury found for plaintiff and against Dr. Torbey, one of only two remaining defendants, in the amount of Seven Hundred Fifty Thousand Dollars ($750,000). The jury found the other defendant, McNeil Laboratories, Inc., was not liable for Mrs. Laptad's injuries.

The defendant herein, The Medical Protective Company [hereinafter Medical Protective], insured Dr. Torbey with respect to the malpractice action under a primary policy of insurance in the amount of One Hundred Thousand Dollars ($100,000). Plaintiff in this action, Insurance Company of North America [hereinafter INA], insured Dr. Torbey under an excess policy of insurance in the amount of One Million Dollars ($1,000,000) that became effective upon the exhaustion of the primary limits of the Medical Protective policy.

This is a controversy between these two insurance carriers. Plaintiff, INA, claims that defendant, Medical Protective, negligently and in bad faith failed to pursue settlement negotiations in the civil action between Mrs. Laptad and Dr. Torbey, and failed to settle that dispute within the limits of the Medical Protective policy.

Under the terms of its policy, Medical Protective was obligated to defend Dr. Torbey with respect to the *Laptad* action. Medical Protective defended Dr. Torbey throughout the entire action, including two jury trials and a subsequent appeal. Medical Protective retained Emmet Blaes and his law firm, Yocum, Sargent and Blaes, of Wichita, Kansas, to defend Dr. Torbey. Mr. Blaes and his firm also provided a defense for Dr. Stewart in the *Laptad* case.

Nearly all Medical Protective contacts with Dr. Torbey concerning the *Laptad* action were through Mr. Blaes by way of personal meetings, telephone calls and letters. In this case, as in most cases, Medical Protective's policy was that all contact between the insured doctor and the insurance company generally was by or through defense counsel retained by Medical Protective.

By December 31, 1970, the evidence as to what occurred during Mrs. Laptad's arteriogram had been determined through discovery. On December 23, 1970, plaintiff advised all defendants at a pretrial conference of the claims that would be made against each defendant.

Plaintiff's counsel, Gerald Michaud, gave his reasons for Dr. Torbey's negligence. Mr. Michaud contended that Dr. Torbey was negligent as "captain of the ship," that is, he was responsible for everyone in the x-ray room. Furthermore, Dr. Torbey was the only doctor present when the crisis occurred, but stood by and did nothing while Mrs. Laptad suffered irreversible brain damage. Mr. Michaud argued Dr. Torbey was negligent specifically for not having instituted a "code blue" alarm, that is, a cardiac arrest alarm, and for conducting a radiographic procedure in a room which was not connected with the alarm system. The plaintiff further claimed that Dr. Torbey knew or should have known that Ms. Reese was not qualified to be left alone with the patient and should have insisted otherwise.

Other allegations of negligence were that the procedure should not have gone forward without an EKG monitor connected to the patient, and that the procedure should not have been done under the circumstances considering the state of Mrs. Laptad's health on that day.

Mrs. Laptad's injuries were catastrophic. As a result of the accident, she sustained severe brain damage and was comatose. She was thirty-seven years old at the time, married, and had two minor children. Following the accident, Mrs. Laptad remained at Wesley Medical Center until September, 1970, when she was moved to a nursing home in Sarcoxie, Missouri. There was some evidence that Mrs. Laptad was conscious from time to time, and was aware to some extent of what had happened to her. There was evidence that Mrs. Laptad had a short life expectancy as a result of her injuries.

On January 4, 1971, Mr. Michaud offered to settle with all defendants in the amount of Five Hundred Thousand Dollars ($500,-000). This offer was to remain open until February 15, 1971. After February 15th, the settlement offer would increase to Six Hundred Thousand Dollars ($600,000). Mr. Michaud further stated that if the defendants could not agree to the $500,000 figure, he would negotiate with each of them individually. Although defense counsel were not aware of a jury verdict in excess of Three Hundred Twenty-Five Thousand Dollars ($325,000) in the state of Kansas at that time, Mr. Blaes and other defense counsel considered Mr. Michaud's settlement offer of $500,000 to be a reasonable offer.

Mr. Michaud had considerable experience in the trial of this sort of lawsuit. In Mr. Michaud's opinion, this case was the best case he had ever had insofar as its potential for a verdict. In Mr. Michaud's opinion, this case had the potential of being the first million dollar jury verdict in the state of Kansas.

In a January 11, 1971, communication between Mr. Blaes and Medical Protective, Mr. Blaes stated that the case against Dr. Torbey was strong enough to be submitted to a jury. In Mr. Blaes' opinion, a jury might very well return a plaintiff's verdict on the basis of sympathy for the "horrendous damage" suffered by Mrs. Laptad. Mr. Blaes recognized that sympathy was a slender thread upon which to build a plaintiff's verdict, but that such verdicts tended to be affirmed on appeal. Mr. Blaes, however, recommended that Dr. Torbey's contribution to a joint settlement be minimal.

On February 1, 1971, Mr. Blaes wrote a comprehensive report to Medical Protective and recommended that Medical Protective authorize a sum of Twenty-Five Thousand Dollars ($25,000) for contribution toward a settlement with the plaintiff. By letter dated February 3, 1971, Medical Protective gave Mr. Blaes the $25,000 authority.

On January 29, 1971, all defense counsel met. Mr. Tinker, Dr. Fieldman's attorney, informed them that the experts he had consulted were critical of practically everyone concerned. Dr. Torbey was singled out for fault specifically because, even though he was the only physician in the room at the time, he took no action during plaintiff's episode, other than to call for Dr. Fieldman. The experts justified a conclusion that Dr. Torbey should have put aside his role as a specialist and should have undertaken procedures to restore blood pressure and respiration. Dr. Torbey was also criticized for having left Mrs. Laptad under the care of Ms. Reese. Furthermore, there was evidence Dr. Torbey improperly diluted the material he was injecting into Mrs. Laptad, and there was evidence that he should have initiated some kind of therapy for reversing her cerebral edema while waiting for Dr. Fieldman.

In early February, 1971, Medical Protective decided to adopt the position that they would rather take their chances on winning a jury verdict rather than offering a very high figure to the plaintiff to settle the case. Medical Protective indicated to Mr. Blaes that they would be willing to increase the $25,000 settlement offer only slowly and reluctantly.

On February 12, 1971, Mr. Tinker offered Mr. Michaud Three Hundred Twenty-Five

Thousand Dollars ($325,000) on behalf of all the defendants to settle the case. This offer included a figure of $25,000 for Drs. Torbey and Stewart. Dr. Torbey had no knowledge that a settlement offer had been made on his behalf. On behalf of Mrs. Laptad, Mr. Michaud rejected this offer.

On February 15, 1971, Mr. Blaes spoke with Mr. Davis of Medical Protective concerning settlement negotiations. They agreed to stand on their offer of $25,000. They agreed to litigate the action rather than pay a greater amount. Nevertheless, on February 16, 1971, all defense counsel met again to discuss settlement of the case. Defense counsel agreed to make an offer of Four Hundred Thousand Dollars ($400,000) to settle the case. This offer included a Fifty Thousand Dollar ($50,000) contribution from Drs. Torbey and Stewart. This offer was rejected by Mr. Michaud. Dr. Torbey did not know this settlement offer had been made on his behalf.

After some negotiation, Mr. Michaud made a counter-offer to settle the case for Four Hundred Twenty-Five Thousand Dollars ($425,000), with a reservation of rights against McNeil Laboratories, Inc. This counter-offer contemplated a One Hundred Fifty Thousand Dollar ($150,000) joint contribution from Wesley Medical Center, Dr. Torbey and Dr. Stewart. Wesley Medical Center was willing to contribute at least Seventy-Five Thousand Dollars ($75,000) to the joint settlement. This would leave Drs. Torbey and Stewart within the $50,000 offer they had previously made. Mr. Blaes, however, rejected this $50,000 figure as "impossible." Mr. Michaud's counter-offer of $425,000 was not communicated by Mr. Blaes and Medical Protective to Drs. Torbey or Stewart. When the counter-offer was made, it was not communicated to representatives of INA, although INA was later informed that said counter-offer had been made and had been rejected as "out of the question." On February 16, 1971, therefore, Mr. Blaes and the Medical Protective Company had rejected an offer from the plaintiff which could have settled the case on behalf of all concerned for as little as $50,000.

On February 17, 1971, Wesley Medical Center settled with Mr. Michaud for the sum of $75,000.

During the above-described negotiations in January and February, 1971, representatives of INA occasionally received personal reports from Mr. Blaes concerning some aspects of settlement negotiations and received copies of some correspondence between Mr. Blaes and Medical Protective.

In late April, 1971, Dr. Fieldman settled with Mrs. Laptad for the sum of Three Hundred Thousand Dollars ($300,000). Mr. Michaud had obtained a discovery order from Judge Brown of this district, which allowed discovery of the extent of Dr. Fieldman's medical malpractice insurance coverage. Mr. Michaud agreed to the $300,000 settlement because Dr. Fieldman's counsel, Mr. William Tinker, Sr., represented to Mr. Michaud and to Judge Brown in open court that $300,000 was the total amount of Dr. Fieldman's insurance coverage. Dr. Fieldman was actually insured in the amount of One Million One Hundred Thousand Dollars ($1,100,000). If Mr. Michaud had known the true extent of Dr. Fieldman's insurance coverage, Mr. Michaud would not have settled the case against Dr. Fieldman except for a sum substantially in excess of $300,000. Dr. Fieldman's insurance carrier was INA, the plaintiff in this case.

On June 9, 1971, Mr. Michaud offered to settle with Drs. Torbey and Stewart for $75,000. The offer contemplated a $25,000 contribution from Dr. Stewart and a $50,000 contribution from Dr. Torbey. There is no evidence that this offer was ever communicated to Dr. Torbey. Medical Protective refused to negotiate on the basis of this offer.

Nevertheless, on or about July 12, 1971, without authorization from Medical Protective, Mr. Blaes suggested to Mr. Michaud a figure of Thirty-Seven Thousand Five Hundred Dollars ($37,500) to settle the case. In November, 1971, Medical Protective granted Mr. Blaes the authority to settle the case for $37,500. After he received this authori-

ty, Mr. Blaes never offered Mr. Michaud more than this amount.

Considering all of the relevant circumstances, Mr. Michaud's June 9, 1971, offer of $75,000 to settle the case was a reasonable amount.

By February 14, 1972, Mr. Michaud was expecting to receive a report evaluating Dr. Torbey's negligence from an expert witness named Dr. Dornette. Mr. Michaud's offer of settlement in the sum of $75,000 was still pending. Mr. Michaud expected Dr. Dornette would be extremely critical of Dr. Torbey's conduct in regard to Mrs. Laptad's injury. Mr. Michaud indicated that his settlement offer of $75,000 would be withdrawn once Mr. Michaud received Dr. Dornette's critical report. Mr. Blaes recognized that the greatest danger to Dr. Torbey's defense would be that the jury might find Dr. Torbey negligent because he was the only doctor in the room at the time Mrs. Laptad's brain was being catastrophically destroyed. Mr. Blaes further recognized a jury might find against Dr. Torbey because of sympathy for Mrs. Laptad. Mr. Blaes would have been comfortable settling the case against Dr. Torbey for a sum between Fifty and Sixty Thousand Dollars ($50,000–$60,000). Mr. Blaes felt that the lawsuit against Dr. Torbey could be one in which a jury verdict might be in excess of $500,000. Nevertheless, neither Mr. Blaes nor Medical Protective accepted this offer or made a counter-offer.

By August 18, 1972, Mr. Michaud had received Dr. Dornette's report, which was extremely critical of Dr. Torbey's conduct, and Mr. Michaud withdrew his $75,000 settlement offer. Although the settlement offer was withdrawn, it would have been possible for Dr. Torbey's representatives to have negotiated and attempted to settle the case.

On September 30, 1972, Mr. Blaes informed Medical Protective that Dr. Dornette's report was very critical of Dr. Torbey and that Mrs. Laptad's damages might very likely be greater than had first been expected. Despite this information, Medical Protective failed to re-evaluate the *Laptad* claim.

From November, 1972, until September, 1974, there was little settlement negotiation between Dr. Torbey and Mrs. Laptad. During this period, however, there was inflation in jury verdicts in severe medical malpractice actions. Mrs. Laptad was living in a semi-comatose state in a nursing home, and her damages were mounting continuously during this period. Despite this increase in damage potential, Medical Protective decided not to pursue settlement negotiations in the hopes that they might, in their words, "get lucky" when the *Laptad* case finally went to trial.

In September, 1974, a month before trial, Mr. Michaud obtained authority to settle the *Laptad* case against Dr. Torbey for the amount of $50,000. This authority was obtained from the Probate Court of Jasper County, Missouri, where Mrs. Laptad's nursing home was located. Mr. Michaud did not advise Mr. Blaes that the claim against Dr. Torbey could be settled for $50,000.

In September, 1974, Mr. Nyberg, who was monitoring the *Laptad* action for INA, had a meeting with Mr. Blaes. During the meeting, Mr. Blaes requested that INA make a contribution toward a settlement for an amount within Medical Protective's policy limit. Mr. Nyberg suggested that INA might be willing to make such a contribution. Notwithstanding Mr. Nyberg's suggestion, Mr. Conway, the INA Denver representative handling the *Laptad* action, instructed INA's local representative to advise Mr. Blaes that INA expected him to settle the case for an amount within Medical Protective's policy limit.

On September 23, 1974, Mr. Blaes spoke with Mr. LaStringer, who was managing the *Laptad* file for Medical Protective. Mr. Blaes suggested Medical Protective would be justified in raising their $37,500 settlement offer by Five Thousand Dollars ($5,000). Mr. LaStringer rejected this idea and stated that Medical Protective would rather pay Mr. Blaes to try the case than to pay the plaintiff any amount.

On October 11, 1974, the Friday before the first trial commenced, Mr. Michaud advised Mr. Blaes that he would take something less than $75,000 to settle the case against Dr. Torbey. Mr. Blaes immediately forwarded this information to Medical Protective.

Mr. Michaud told Mr. Blaes that all prospects for settling the case and all settlement negotiations would terminate on October 15, 1974, when Mr. Michaud made his opening statement to the jury in the *Laptad* action. Medical Protective failed to respond to Mr. Michaud's offer of settlement. Mr. LaStringer continued to adhere to his September 23, 1974, position of refusing to settle the case and refusing to negotiate with Mr. Michaud.

On October 14, 1974, INA's local representative, Mr. Nyberg, spoke with Mr. Blaes and advised him that INA would not make any payment in the *Laptad* action until Medical Protective's policy limits were exhausted. Mr. Nyberg further demanded that Mr. Blaes settle the *Laptad* action within Medical Protective's policy limits. Neither Mr. Blaes nor anyone from Medical Protective took any further action to settle the case following this demand.

Dr. Torbey was not informed or advised of any settlement offers or demands or negotiations prior to October 17, 1974. The evidence fails to prove that Mr. Blaes or Medical Protective seriously discussed the possibility of settlement with Dr. Torbey before October 17, 1974. There is no proof in the evidence before the court that Dr. Torbey was ever advised of settlement demands until long after they were made.

Dr. Torbey was informed of settlement negotiations during the commencement of the first trial. At that time, Dr. Torbey was informed that plaintiff had offered to settle the case for a figure near $75,000. Dr. Torbey had to decide quickly whether or not he wanted to settle. He was not informed that Medical Protective had decided to proceed with the trial unless the action could be settled for the sum of $37,500. Neither Mr. Blaes nor Medical Protective advised Dr. Torbey that he could protect his professional reputation by settling the action while denying liability. Neither Mr. Blaes nor Medical Protective informed Dr. Torbey that he faced liability over and above Medical Protective's policy limits and that he should retain private counsel to protect his personal interests.

Medical Protective has argued to this court that there was no need to inform Dr. Torbey of settlement negotiations because Dr. Torbey had indicated to Mr. Blaes that he would not settle the *Laptad* action under any circumstances. The court cannot accept this. The conduct of Mr. Blaes and Medical Protective during settlement negotiations is inconsistent with the contention that they did not have Dr. Torbey's consent to settle the action. Medical Protective extended settlement authority to Mr. Blaes in various amounts throughout the pretrial period. Mr. Blaes actively participated in settlement negotiations with plaintiff. Defendant admits, at page 26 of their requested findings of fact, that if an acceptable settlement amount could have been negotiated with the plaintiff, Mr. Blaes could have convinced Dr. Torbey to settle the lawsuit.

The settlement procedure followed by Mr. Blaes was commonly used by defense counsel in attempting to settle medical malpractice cases. It is common practice for defense counsel to negotiate an acceptable settlement figure with plaintiff's counsel and then to obtain or attempt to obtain the insured doctor's consent to such settlement. However, the failure of Mr. Blaes and Medical Protective to keep Dr. Torbey informed and advised of settlement negotiations renders Dr. Torbey's alleged refusal to consent to the realm of speculation. Furthermore, if Dr. Torbey was concerned for his professional reputation, Mr. Blaes and Medical Protective should have explained to him the possibility that he could enter into a settlement agreement with the plaintiff while disclaiming fault. Furthermore, Mr. Blaes and Medical Protective should have taken steps to inform Dr. Torbey of the possible adverse effect a public verdict would have on his professional reputation.

On October 17, 1974, Mr. Blaes dictated a letter for Dr. Torbey's signature in which Dr. Torbey indicated that he wished Mr. Blaes to proceed to trial to defend plaintiff's claims against him. This letter suggests that Dr. Torbey was unaware of the possibility of settling the *Laptad* action while denying fault or liability on his part. This letter does not state that Dr. Torbey refused to settle the action and does not state that Dr. Torbey was fully informed by Mr. Blaes and Medical Protective of all settlement offers and negotiations.

Medical Protective did not keep INA fully informed and advised of settlement offers and negotiations. From the record, the court concludes that INA was only informed of Mr. Michaud's settlement demands long after they were made. INA was never informed that Medical Protective would adhere to their $37,500 settlement offer, that they were hoping to "get lucky," or that they would rather pay Mr. Blaes to defend the case than to pay Mr. Michaud anything.

Medical Protective ignored Mr. Blaes' personal evaluation of the *Lapstad* case for settlement purposes at $50,000 to $60,000. At one point in the negotiations, before November, 1971, Mr. Blaes informed Mr. Michaud that he would stick his neck out and try to gain approval of a $50,000 offer. Medical Protective failed to approve that offer.

The first trial ended in a hung jury. The second trial commenced on May 13, 1975. The second action concluded on July 14, 1975, when the jury returned a verdict against Dr. Torbey in the amount of $750,-000. The trial court denied Dr. Torbey's motion for a new trial, but credited plaintiff's earlier settlements with Dr. Fieldman and Wesley Medical Center against the verdict returned against Dr. Torbey. The court of appeals affirmed. *Lupton v. Torbey,* 548 F.2d 316 (10th Cir.1977).

The parties admit that the standard of care for an insurer was decided by *Bollinger v. Nuss,* 202 Kan. 326, 449 P.2d 502 (1969). In that case, the court held that an insurance company, in defending and settling claims against its insured, owes a duty not only to act in good faith, but also to act without negligence. An insurer may be held liable in excess of the limits of its policy if it acts negligently or in bad faith when considering offers to settle a claim against an insured for an amount within the policy limits. An insurer may properly give consideration to its own interests, but it also must give at least equal consideration to the interests of the insured. In acting on offers of settlement within the policy limits, an insurer must conduct itself with that degree of care that would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim.

Whether an insurer was negligent or acted in bad faith in refusing an offer of settlement within policy limits is a question of fact. *Bollinger* provides us with some guidelines. The amount of financial risk to which Dr. Torbey and INA were exposed in the event of a refusal to settle is a relevant factor in determining whether Medical Protective is liable for the entire judgment. *Id.,* 202 Kan. at 340, 449 P.2d at 513. The strength of Mrs. Laptad's case must be evaluated as it appeared at the time the settlement offer was refused. *Id.* The value of her unlitigated claim must be determined on its own apparent merits, or lack thereof, the possibility of liability being established, and on the injuries and their extent being proven. *Id.,* 202 Kan. at 341, 449 P.2d at 513.

After considering each of these elements, the court finds the defendant, Medical Protective, liable for the entire judgment because of their negligence and bad faith in refusing to negotiate and in rejecting Mr. Michaud's settlement offers of $50,-000 and $75,000. The financial risk to which Dr. Torbey and INA were exposed because of the refusal to settle is astonishing. Mr. Blaes and Medical Protective were well aware of the injury and damages suffered by Mrs. Laptad. She was in a nursing home and required 24-hour care. She was unlikely ever to recover from her injury or ever to require less care. With every

day that went by, the amount of her damages increased. Her life expectancy was in excess of thirty years, although there was some evidence that her injuries would cause her a shorter life expectancy. Furthermore, neither Mr. Blaes nor Medical Protective had any reason to be certain the trial court would offset from Mrs. Laptad's recovery, if any, the amount of money she had already received in settlements with other defendants. At the time of the first trial, a verdict in excess of One Million Dollars ($1,000,000) would not have been out of the question, and there is evidence before the court that the jury in the second trial seriously considered returning a verdict against Dr. Torbey in excess of Two Million Dollars ($2,000,000).

The strength of plaintiff's case against Dr. Torbey as it appeared at the time the offers were refused, or ignored as the evidence suggests, also tips the scales against Medical Protective. Mr. Michaud was a first-rate attorney who was thoroughly prepared to prove his case against Dr. Torbey with expert testimony. The nature of Mrs. Laptad's catastrophic injury would be readily apparent to a lay jury. The circumstances of her injury were, for the most part, free of doubt. The evidence would show, without dispute, that Dr. Torbey was the only physician in the room at the time of Mrs. Laptad's injury, and that he stood idly by while her brain was catastrophically destroyed. Certainly, Mr. Blaes had solid evidence that Dr. Torbey was justified in his inaction, but Mr. Blaes and Medical Protective were fully aware that sympathy for Mrs. Laptad might totally negate this defense. Mrs. Laptad's special damages were virtually beyond dispute. Her permanent injury and disability were obvious even to laymen. She was the mother of minor children, she had a previous work history with wage earning records, and there was some evidence of conscious suffering.

The record before the court indicates that the attorneys involved did not differ greatly in their evaluation of Mrs. Laptad's unlitigated claim on its merits. Mr. Blaes felt the case was worth between $50,000 and $60,000, and Mr. Michaud, although he valued the case at a much higher figure, had made a settlement demand of $75,000. Given these facts, the court finds little justification in Medical Protective's failure to move from their figure of $37,500.

■ It is incumbent upon an insurer to make reasonable efforts to negotiate a settlement of a claim against an insured. *Rector v. Husted*, 214 Kan. 280, 519 P.2d 634 (1974). Fair consideration of the insured's vulnerable position demands that reasonable efforts be made to protect him from exposure in an amount well above the policy limits. *Id.* Reasonable efforts include the initiation of reasonable settlement offers by an insurance company. *Id.* at 241–42, 519 P.2d 634. Medical Protective acted negligently and in bad faith in failing to take reasonable steps to move settlement negotiations beyond the impasse which existed between the fall of 1972 and the fall of 1974. Reasonable efforts include the initiation of settlement offers, as well as increasing the reserves beyond $37,500 in light of Mr. Blaes' evaluation of the case at a higher figure and the tremendous exposure faced by the insured, Dr. Torbey, and the excess carrier, INA. Medical Protective had a duty to continue settlement negotiations even though the plaintiff never made a settlement offer below $75,000, in order to avoid prejudicing the interests of its insured. *Covill v. Phillips,* 452 F.Supp. 224, 240 (D.Kan.1978). See also *Coleman v. Holecek,* 542 F.2d 532, 538, at n. 7 (10th Cir. 1976).

■ Medical Protective was under a duty to communicate to Dr. Torbey and to INA all indications of liability in excess of the policy limits and all offers of settlement so that they might take proper steps to protect their own interests. *Bollinger v. Nuss, supra,* 202 Kan. at 339, 449 P.2d at 512. The court concludes from the evidence that Dr. Torbey's decision to litigate this case and his refusal to settle the case was based on inadequate information. The court concludes that Dr. Torbey was never fully aware of the extent of his exposure in the *Laptad* case, and he had not been kept

informed of settlement negotiations. Therefore, it is immaterial whether or not Dr. Torbey gave his consent to settle the *Laptad* case. He did not have enough information to make a meaningful decision. Without Dr. Torbey's knowledge and without his consent, Medical Protective gambled with his money and the money of INA in the *Laptad* action in the hope that they would "get lucky." They were not lucky, and they will have to bear the expense of their bad luck.

Medical Protective has argued that INA should be estopped from being subrogated from the rights of Dr. Torbey in regard to Medical Protective's negligence and bad faith in failing to settle the *Laptad* action. Medical Protective bases its claim of estoppel on the fact that Mr. William Tinker, Sr., the attorney retained by INA to represent Dr. Fieldman in the *Laptad* action, misrepresented the maximum limits of Dr. Fieldman's insurance coverage to Mr. Michaud, and misrepresented those limits to Judge Brown at a hearing held for the purpose of approving the settlement between Mrs. Laptad and Dr. Fieldman.

If such a misrepresentation occurred, it would be very distressing to the court. As the court recalls the evidence, Judge Brown of this district ordered Dr. Fieldman to disclose the extent of his insurance coverage to Mr. Michaud. This order, of course, contemplated a true and accurate disclosure. However, the court need make no finding as to whether or not such a misrepresentation occurred, because if it occurred it was a misrepresentation of an attorney who represented Dr. Fieldman, and not that of an attorney who represented INA. No matter who paid Mr. Tinker's bills in the defense's settlement of the *Laptad* action, Mr. Tinker represented only Dr. Fieldman. DR 5–107(B). The court finds it impossible to conclude that INA had anything to do with this misrepresentation, if it occurred. Furthermore, Medical Protective is not the proper party to raise the defense of estoppel. *Cosgrove v. Young*, 230 Kan. 705, 642 P.2d 75 (1982).

Medical Protective argues that no matter what result the court reaches in this case, the court must order INA to contribute a pro rata share of Medical Protective's costs in defending Dr. Torbey in the *Laptad* action. Medical Protective relies on *American Fidelity Ins. Co. v. Employer's Mutual Casualty Co.*, 3 Kan.App.2d 245, 593 P.2d 14 (1979), wherein the following rule of law is stated:

"... Where the claim is over the limits of the primary policy and only one insurer undertakes the defense, the primary insurer and the excess insurer will each be liable for a pro rata share of the costs of defense in proportion to the amount of the claim each is required to pay." *Id.* at Syl. 10, p. 246, 593 P.2d 14.

The court finds against Medical Protective on their claim for defense costs. First, the Medical Protective policy issued to Dr. Torbey provided for unlimited defense with the cost of defense to be considered separately from the policy limits. The policy contains no provision for the sharing of defense costs with an excess insurer. Therefore, the contract controls Medical Protective's liability for defense costs. *Signal Companies v. Harbor Ins. Co.*, 27 Cal.3d 359, 165 Cal.Rptr. 799, 612 P.2d 889 (1980). Furthermore, Medical Protective never made a request that INA contribute a pro rata share to defense counsel until this lawsuit was commenced.

Next, INA's policy provided that INA might be required to defend if the underlying policy of insurance was exhausted by an occurrence. This provision does not require sharing of defense costs in the *Laptad* action because there was no exhaustion of Medical Protective's policy limits until the final judgment was affirmed by the United States Court of Appeals for the Tenth Circuit. After the *Laptad* action was completed, no further defense was necessary.

The court also notes the rule of law quoted in *American Fidelity Ins. Co. v. Employers Mutual Casualty Co., supra,* is *obiter dictum,* and does not necessarily state the law in the state of Kansas. The Court of Appeals itself noted that there was nothing

to indicate that American Fidelity, the excess insurer, had an obligation to pay any judgment or settlement at the time the case came before them. *Id.,* 3 Kan.App.2d at 256, 593 P.2d at 23. Furthermore, the case relied upon by the Court of Appeals in reaching their conclusion, *Continental Casualty Co. v. Zurich Ins. Co.,* 57 Cal.2d 27, 17 Cal.Rptr. 12, 366 P.2d 455 (1961), appears to have been seriously restricted by *Signal Companies v. Harbor Ins. Co., supra.*

Finally, the court finds nothing in *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.,* 212 Kan. 681, 512 P.2d 403 (1973), which supports Medical Protective's claim for contribution to defense costs. *Spruill Motors* stands for the proposition that an insurer bears a duty to defend where facts known or reasonably ascertainable give rise to the potentiality of liability under an insurance policy. The court has no doubt this rule of law applies to a primary insurer such as Medical Protective in the *Laptad* case, but the case is silent about an excess insurer's duty to defend and has nothing at all to say about sharing the costs of defense.

INA seeks an award of attorneys' fees under K.S.A. 40–256, which provides:

"That in all actions hereinafter commenced, in which judgment is rendered against any insurance company . . . if it appear from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action, . . . to be recovered and collected as a part of the costs . . . "

Under Kansas law, whether or not attorneys' fees shall be allowed depends on the facts and circumstances of each particular case. *Dronge v. Monarch Ins. Co. of Ohio,* 511 F.Supp. 1, 5 (D.Kan.1979). In *Covill v. Phillips,* 455 F.Supp. 485 (D.Kan.1978), Chief Judge O'Connor discussed the court's function:

" . . . It is a question for the district court as the trier of the facts to determine whether an insurance company has refus-

ed to pay the full amount of an insured's loss 'without just cause or excuse,' thereby subjecting itself to payment of an attorney's fee under K.S.A. § 40–256. *Koch, Administratrix v. Prudential Ins. Co.,* 205 Kan. 561, 470 P.2d 756 (1970). In this regard, it is the insurer's activity or lack thereof *prior to commencement of the action* which determines whether or not a refusal to pay is without just cause or excuse. *Sloan v. Employers Casualty Ins. Co.,* 214 Kan. 443, 521 P.2d 249 (1974). Whether there was any reasonable ground for contesting the claim depends upon circumstances existing when payment is withheld or liability is declined, and is not determined by the outcome of the ensuing litigation. *Wolf v. Mutual Benefit Health & Accident Ass'n,* 188 Kan. 694, 366 P.2d 219 (1961)." *Id.* at 487–88.

K.S.A. 40–256 has never been applied to an action by an excess insurer against a primary insurer. Therefore, the question before the court is one of first impression. In a case such as this, the court is not concerned with Medical Protective's conduct in the *Laptad* action, but the court turns its attention to the "circumstances existing when payment [was] withheld or liability [was] declined." *Covill v. Phillips, supra,* 455 F.Supp. at 487. This means the court's attention should focus on Medical Protective's refusal to pay INA prior to the commencement of this lawsuit. *Id.* See also *Sloan v. Employers Casualty Ins. Co., supra.*

■ In this regard, the court finds against plaintiff's application for a reasonable attorney fee. K.S.A. 40–256 speaks of an insurance company which has "refused" to pay. This "surely contemplates a demand which has been denied" prior to the commencement of a lawsuit. *Sloan v. Employers Casualty Ins. Co., supra,* 214 Kan. at 444, 521 P.2d at 251. There is no evidence before the court that INA ever made a demand for payment upon Medical Protective. A lawsuit filed before an insurance company has had an opportunity to investigate and select its course, and before a

demand for payment has been made, cannot form the basis for a claim for attorneys' fees. *Covill v. Phillips, supra,* 455 F.Supp. at 488.

The court further finds that Medical Protective's denial of liability was neither frivolous nor without just cause or excuse. *Id.* In the court's opinion, the controversy between the two insurance companies in this lawsuit was a good faith legal controversy which involved several substantial questions of fact, including Dr. Torbey's consent or lack thereof to a settlement of the *Laptad* action, and the existence of a timely demand for settlement from INA prior to the first trial of the *Laptad* action. Medical Protective had reasonable factual and legal grounds for denying liability for the excess judgment rendered against Dr. Torbey, and, in the court's opinion, attorneys' fees should not be imposed merely because the court has failed to find in their favor. See *Covill v. Phillips, supra,* 455 F.Supp. at 488; *Koch, Administratrix v. Prudential Ins. Co., supra,* 205 Kan. at 565, 470 P.2d at 760. The court therefore finds that plaintiff's application for attorneys' fees pursuant to K.S.A. 40–256 should be denied.

INA requests compensation for the loss of use of the money that Medical Protective should have paid them. As far as the court can find, this question has not been briefed. As stated in *Industrial Risk Insurers, et al. v. Employers Mutual Casualty Co.,* No. 80–2419 (D.Kan., *unpublished,* 2/11/83), "compensation for use of money is only another name for interest. Interest is 'compensation for the loss of use or forbearance of money.' *Rosen v. United States,* 288 F.2d 658, 660 (3rd Cir.1961), [*quoting Deputy v. du Pont,* 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940)]. Such damages are prejudgment interest if they compensate an injured party for the loss of use of money, in other words, forebearance, before judgment." Before the court will allow INA to recover damages for prejudgment interest, it must be presented with some proof that the plaintiff is entitled to pre-judgment interest. No entitlement has been shown to date; therefore, the court will deny plaintiff's request for pre-judgment interest.

The court concludes that INA is entitled to be subrogated to the rights of Dr. Torbey under Dr. Torbey's Medical Protective insurance policy. The court concludes that INA is entitled to be treated as if it were the insured under the Medical Protective policy involved in the *Laptad* action. The court concludes that INA is entitled to judgment herein because of Medical Protective's negligence and bad faith in its handling of the *Laptad* action.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered in favor of plaintiff and against defendant in the sum of Three Hundred Twenty-Three Thousand One Hundred Twenty-One and 90/100 Dollars ($323,121.90). Interest shall accrue at the legal rate from the date of this Memorandum and Order. Each party is to bear its own costs.